UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION


UNITED STATES OF AMERICA   :   Criminal Action No.

    v.                 :   PJM 03-457

KENNETH LIGHTY, et al.,    :   Greenbelt, Maryland

        Defendant.    :   Friday, August 12, 2005

_____/



TRANSCRIPT OF TELEPHONE CONFERENCE
BEFORE THE HONORABLE PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:   ROBERT HARDING, ESQUIRE
Office of the U.S. Attorney
6500 Cherrywood Lane, Suite 400
Greenbelt, Maryland   20770
301-344-4433




FOR THE DEFENDANT:   JEFFREY B. O'TOOLE, ESQUIRE
DANYA ARIEL DAYSON, ESQUIRE
O'Toole, Rothwell, Nassau & Steinbach
1350 Connecticut Avenue, NW, Suite 200
Washington, D.C   20036
202-775-1550




OFFICIAL COURT REPORTER:   LINDA C. MARSHALL,(301) 344-3229

COMPUTER-AIDED TRANSCRIPTION OF STENOTYPE NOTES

**P–R–O–C–E–E–D–I–N–G–S**

THE COURT:  Counsel, Judge Messitte here.

MR. HARDING:  Judge, Robert Harding from the United States Attorneys office.

DR. SHAPIRO:  This is Dr. Shapiro, Judge.

MR. O'TOOLE:  Your Honor, this is Jeff O'Toole and Danya Dayson.

DR. O'CONNELL:  And this is Dr. Michael O'Connell.

THE COURT:  All right.  I have a court reporter here.  So, Mr. O'Toole, I guess I'll hear from you.

MR. O'TOOLE:  Your Honor, thank you for taking the time to do this.

THE COURT:  Okay.

MR. O'TOOLE:  We submitted, as you know, a notice, but the testing -- and perhaps the Court has our notice before you.

THE COURT:  Right.

MR. O'TOOLE:  We also, there's also an order that you signed talking about what the parameters of the government's testing can be if the notice is given by defense.

Also, we have a proposed testing by the government, which includes not only tests which would be trying to rebut our testing, but also testing that goes considerably beyond that personality testing and looking for diagnoses, and in general, going far beyond rebuttal.

I don't know if the Court has the notice that Mr.

Harding sent to us, but it's clear to us and clear to our expert that the testing that they propose goes far beyond rebuttal testing. It's clear that the order that you signed and in particular --

THE COURT: Wait a minute, Mr. O'Toole.

Did the government send something?

MR. HARDING: Yes, Your Honor, I sent a notice to my adversary and to my experts, but I didn't copy the Court.

THE COURT: Okay. I'm not finding what you're talking about.

MR. HARDING: It's a letter I wrote of August 9th that simply identifies the two government experts and list a number of tests that one of the experts, Dr. Shapiro, who is on the line right now, proposes to give in rebuttal to the defense notice.

THE COURT: Well, do I need that document in front of me to decide this matter?

MR. HARDING: Well, Your Honor, you only need it to the extent that it's clear from reading the testing that they propose that it goes far beyond what you in your order and what 12.2 demands, and the case law states shall at all, states what can be done by the government by way of testing that judging by the government is framed by the notice that is prepared by the defense.

THE COURT: Well, let me understand what the

government's position is before you go any further.

What is your position, Mr. Harding, about these tests?

MR. HARDING:  Our position -- and first, let me say that I will fax a copy of my letter to your chambers immediately after this conference call.  And for purposes of this conversation, I will -- if Your Honor wants, I will simply read the list of tests off to you, but I suspect that unless you have a Ph.D in psychology, they won't mean a great deal to you. They're just some standard names of some standard tests similar to the standard tests and defense contend that they are different.

The government's position is that the defense has given us notice that includes a whole battery of neuropsychological tests and we cannot replicate any of those tests, because there is something called the practice effect that prevents repeat of the same test for a substantial period of time, because the repeat would be distorted by the fact that the person had previously received the same test.  So, we can't repeat their tests.

Dr. Shapiro, who is on the line and can explain this in better detail than I can, maintains that his tests are all neuropsychological tests; that there are some that delve into personality issues, but that the defense tests also include personality tests.  The anxiety inventory and depression inventory too are tests that are mood test, but there is no way

to distinguish mood from personality, and that these tests also, therefore, go into the area of personality.

As I understand it, Mr. O'Toole disputes only certain ones of the government tests that he claims are personality test that Dr. Shapiro is quite adamant that he cannot adequately rebut what the defense tests are going to show without having a full battery of tests available to him to perform.

And he will -- I will call on him to explain in better detail than I can exactly why he says that, but our position is that -- first thing, we cannot begin to guess what the defense experts are going to say.  They've given us only the most broad and vague description of the scope of the experts' testimony and what their examinations are.

So, in order to rebut their case as we are bound to do and allowed to do by this Court's order, we have to be able to perform these tests.

Dr. Shapiro, can you explain in a layman's terms why it is --

DR. SHAPIRO:  Sure, Mr. Harding.  Thank you.

Your Honor, I have some -- some of my concerns, let me just try to summarize it.  When you perform a battery of neuropsychological tests, the test are not like an x-ray or CAT scan or MRI.  What they do is to point to various areas of functioning that might be impaired.  The problem is unless you have broader battery of test, you don't know what is causing

them.

So, in other words, things such as anxiety, depression, presence of a mental illness, presence or absence of motivation, those can all affect the neuropsychological test results. So, in the absence of doing all of those other tests, you don't know what the meaning of those neuropsychological test results are.

The neuropsychological tests, for instance, themselves, they don't have any built-in index for measuring motivation. You know, the person may be faking the test results. And without me doing a broader battery of tests, you don't know whether those tests results are valid.

And the other important thing is the personality test will tell you what, what sort of behaviors a person is going to manifest. In other words, whether when they get emotionally stirred up, whether they pull into themselves, whether they will act in a violent manner.

So, even presuming that there is neuropsychological impairment, the personality tests are the only thing that will address what kinds of behaviors might come out as a result of that impairment. You can't get that information from the neuropsychological test themselves.

MR. O'TOOLE: Jeff O'Toole again, if I could.

THE COURT: Go ahead.

MR. O'TOOLE: Your Honor, the government's position

seems to be and with all due respect to Mr. Harding and Dr. Shapiro, I think they're wrong.  Their position seems to be that in every situation where there's 12.2 notice they want a complete mental health evaluation.

Now, that is absolutely directly contrary to your order signed in this case wherein it states that the testing done by the government shall be testing only, simply and only to rebut the testing done by the defense.

What Dr. Shapiro says is absolutely wrong with respect to malingering.  There is a test that was done by Dr. O'Connell to test for malingering.

DR. SHAPIRO:  May I address that, sir?

THE COURT:  Let him finish his statement.

MR. O'TOOLE:  With respect to the defense tests that we have suggested and we have conducted, it tests his mood with respect to his ability to conduct the testing in his present cognitive state, but it doesn't allow the government to go into a full battery of testing to see what his mood is over the course of time.

If what the government proposes to do, Judge, is authorized, then why did they propose this order?  Why did they propose the exact language, which very specifically was used by you and by Judge Chasanow to limit directly the testing.  It would make 12.2 meaningless and the case law meaningless.

What we would do is say, as soon as the defense says

we want to do testing of any sort and going to introduce any evidence with respect to mental condition, the government can do exactly what they want, including a full mental health evaluation and we'll see what we get.  Everything can affect everything.

If that were the argument, then your specific examples that are put into your order at the bottom of Page 3 by way of example, should the defense provide notice of its intent to introduce expert evidence based upon a substance abuse assessment, for instance, the government evaluation shall assess substance abuse, not other matters --

MR. HARDING:  Judge, your order says --

MR. O'TOOLE:  If I can finish, Mr. Harding.

-- such as personality assessment, such as personality functioning.  So, in the second one, Your Honor, similarly and I think more importantly on point, if the defense gives notice of an intent to rely upon neuropsychological testing, which we are, a measure of function, the government may perform similar testing.  The government may not use the defense notice as the reason to perform an evaluation that reaches beyond that necessary to rebut the defense experts.

Now, if Dr. Shapiro were seeking to treat my client, perhaps this full medical assessment might be necessary.  The government is seeking to execute our client.  That's a far different situation.

So I think what the government is seeking to do, while it may be interesting to Dr. Shapiro and Mr. Harding, is not in the least consistent with your order on this case and Judge Chasanow's order in the *Irvin* case.

THE COURT:  Well, let me go to the specific language that both sides are relying on.  Let me start with you, Mr. O'Toole.  Where is it in the order of June 10 that you are saying that the government is precluded from doing what it proposes to do?

MR. O'TOOLE:  Your Honor, I was reading directly from, I was reading directly from paragraph seven which goes from Page 3 to Page 4.  And this, Your Honor, I would note is an order that was proposed by the United States.  We had, as you know, in our proposed order much more even.  We had this language and we had additional language that we wanted.

We wanted somebody present during the testing and some other matters, and Your Honor found that this was the wording that was appropriate.  And this is not -- if the government now is saying, we don't have enough information to make our testing adequate, perhaps the time to have argued that was when we, before we did our testing, before we submitted our notice and before they submitted this order to the Court.

MR. HARDING:  Judge, may I respond?

THE COURT:  No, before you respond, let me -- what do you understand to be the, the testing that you're relying on?

Are you talking about neuropsychological testing, Mr. O'Toole?

MR. O'TOOLE:  Your Honor, we have neuropsychological testing which we, which we noticed in our 12.2 notice.  And we have very specific testing as your order contemplated that we give them notice of very specific testing.

I would note, as far as I can tell, the doctor chosen by the government is not a neuropsychologist, he's a psychologist.  I'm not sure of the import of that at the moment, but he's not.

Their proposed order and their proposed testing, when you get it, Your Honor, there are a series of test which we do not object to because they are appropriately rebuttal designed test is.

THE COURT:  Is Dr. O'Connell there?

DR. O'CONNELL:  Yes.

THE COURT:  Let me hear from you.  What do you say about all this?  And really, the issue is whether you think the testing proposed by the government somehow goes unreasonably beyond the scope of the testing that you performed.

DR. O'CONNELL:  Okay.  My position was when I, getting back to the specific referral question, I was asked to perform a neuropsychological evaluation to look at cognitive functioning with the specific focus being on cognitive functioning, not on personality.  I was asked not to include personality.

The referral question was to identify mitigating

factors that could help understand the defendant's thinking which could then be incorporated into some of the other evaluations that were going on; the developmental analysis and he also underwent a neurological evaluation.  So it was not an evaluation where the referral question was, is the person competent or responsible or diminished capacity.

And I told and spoke with Mr. O'Toole and Ms. Dayson that some of the limits of this would be that I would not be able to offer a diagnosis in this condition, but that what I would be doing would be to assess his current thinking and whether that could be used as a mitigating factor.

I also did include measures of current mood and effort, because I felt that those were necessary to have any confidence in his performance on the test that I did administer.

THE COURT:  Well, let me ask you two questions.  Do you agree with Dr. Shapiro about the practice effect?  And secondly, is there some way in which your own testing would have been more dependable if you had done more extensive related testing?

DR. O'CONNELL:  Well, I do agree with Dr. Shapiro about the practice effects.  And the -- and to answer your second question, I think the uniqueness of the referral question dictated what tests I felt were appropriate, and what tests I felt, given that there was an interest in simply cognition and not personality, that I could administer and those that I could

not administer.

So, to me it boils down to what, what is the purpose of the testing, what is the referral question.

THE COURT:  Well, stay with that though for a minute. I mean, is there something, how shall I put it, unduly restrictive about the way in which the referral was made that would somehow impede your ability to come to a meaningful conclusion about the individual?

This is not something to be used against you.  I don't see it that way.  I'm just trying to understand whether in fact you're of such a narrow focus that there may be another way to come at the same conclusion that's not necessarily in conflict with yours.

DR. O'CONNELL:  I mean, I felt that it is limited what I can say about the individual, but I viewed it as the goal being simply identifying mitigating factors, and it could be as benign as his behavior while he's being detained.  So I didn't see that I'd be able to provide a meaningful diagnosis or even really comment so much on how his impairments impact his behavior or his alleged behavior, but more simply this is how he's thinking now and that these test results could be used by others who are doing the other evaluations that I mentioned.

THE COURT:  Well, in this context of this particular case, is it reasonable to limit Dr. Shapiro to exactly the tests that you performed given the practice effect?  And

alternatively, is there a way that reasonably Dr. Shapiro could perform similar test, though not identical, that would not unfairly advantage the government in this case?

MR. O'TOOLE:  Your Honor, if I might, before he answers that, just for your information, there's only one test that the government is claiming is running a muck of the practice effect, and that was the WASI.

THE COURT:  Wechsler test.

MR. O'TOOLE:  Right.  The other tests are tests that we don't object to and that they propose, tests that do get around the practice effect.

MR. HARDING:  Judge, the government's problem was, based on the practice effect is that we cannot perform any of the nine tests that this list on Page 2 of their notice because of the practice effect.

MR. O'TOOLE:  You don't have to though, Rob.  You don't have to do that.  You can do other test that you propose --

THE COURT:  Who is speaking now?

MR. O'TOOLE:  This is Jeff O'Toole, Your Honor.

THE COURT:  Okay, go ahead.

MR. O'TOOLE:  There are tests that they have suggested which are appropriate.  The only one that the government has claimed runs a muck of the practice effect was the WASI.

MR. HARDING:  I don't know what you mean, Mr. O'Toole.

That's not the government's position.  I really have to object. We cannot perform, according to Dr. Shapiro, any of the nine tests that appear on Page 2 of your notice.

THE COURT:  Well, stop.

Dr. Shapiro, do you concur with that?

DR. SHAPIRO:  Well, I would certainly agree that the Wechsler is the one most subject to it, but I think that the other neuropsychological tests as well would be subject to a practice effect.

THE COURT:  The others, meaning eight others?

DR. SHAPIRO:  Yeah, not to the same extent as the Wechsler, but it would be practice effect involved.

THE COURT:  Well, let me go back to this question again and Mr. O'Toole sort of intervened before I could get a response.

MR. O'TOOLE:  Apologize, Judge.

THE COURT:  Dr. O'Connell, I really need to hear your view as to whether you think should Dr. Shapiro go forward as he proposes, does that give him what, a larger spectrum of view of this individual than you had?  Does it give the government some sort of unfair advantage in the way they look at this individual that you really are not in the position to rebut, for example? I mean, that's where I need to get some guidance from you.

DR. O'CONNELL:  Well, maybe to go to the first point, there are the battery of test that I administered, but the

question I think is are there alternate versions, alternative versions that measure the same domain that could be administered whereby there wouldn't be such concern of the practice effect.

THE COURT:  Right.  What's the answer to that?

DR. O'CONNELL:  I mean, that's -- I feel that is the case, that there are alternative versions.

THE COURT:  Well, are they proposing them?  I don't have the government's notice.

DR. O'CONNELL:  They are proposing a battery of test that I assume that they feel comfortable with them.

THE COURT:  Well, do you recognize the tests as being roughly comparable?

THE COURT:  Some of them are, yes.  Some I'm not sure would be, you know, my first choice, but --

THE COURT:  Well, question really is, do you think that the test that they propose somehow goes beyond the same kinds of information you were trying to get at whereas you were limited in getting at them by the tests that you chose?

DR. O'CONNELL:  Other than the tests that look at personality and psychiatric symptoms, those are test that I did not administer and those are included in the battery that they propose.

THE COURT:  And you say that that would give them a what, how should I put it, a broader view of the --

DR. O'CONNELL:  They're examining domains that I

specifically under instruction did not examine.

THE COURT:  Now, I guess I go back to a question I asked earlier though.  Does it really only make sense to understand the domains that you examined, to also have examined those domains that?  And I think that's what Dr. Shapiro said in his opening remarks.  What is your view on that, Dr. O'Connell?

DR. O'CONNELL:  Judge, I'm sorry.  Could you say that one more time?

THE COURT:  Does it only make sense to have the personality tests in order to really interpret the results of the other tests, which is what I think Dr. Shapiro was suggesting in his opening remarks?

DR. O'CONNELL:  I think it is helpful in developing a comprehensive assessment.  The challenge is, if you don't want to assess personality in the 12.2 notice, you do not want to assess certain things.  It is then challenging to come up with a battery of tests that excludes a certain domain, and that's what I attempted do.

I would also say, though, that not every situation where you administer an IQ test or neuro-psyche test that you have to also administer personality.  I think it helps give a holistically picture of the individual and answers certain questions, but I didn't feel that for the specific question that I was asked --

In fact, I was -- one of the parts of the question

that I was asked, the instruction was not to assess personality.

THE COURT:  All right.  Dr. Shapiro, if you were not to do the personality tests; that is, you do some of the ultimate tests that Dr. O'Connell feels are fairly similar, but avoid the one or two domains that are dissimilar, can you still come up with some sort of meaningful opinion?

DR. SHAPIRO:  Well, yes and no, Your Honor, if I can explain this.  One of the, one of the points is Dr. O'Connell did a very comprehensive neuropsychological assessment.  There are really no other test batteries from a neurological point of view that would give that comprehensive an assessment.

The things that I was left and that I proposed are merely what are called neuropsychological screening tests, so that they really wouldn't, you know, have the import nor the comprehensiveness of the kinds of stuff that Dr. O'Connell did. From a neuropsychological and cognitive point of view, they would be much more limited, because he's already, you know, done the comprehensive battery and it can't be repeated.

And I would still go back to my initial point, is that even if those tests show impairment, you don't know what that impairment means in terms of the person's behavior unless you pushed in the broader context of the personality.

THE COURT:  Well, let me put it very bluntly to you, Dr. Shapiro.  Can you live with -- maybe not happily, not professionally outside this case -- with doing the identical

tests that he did or similar test not including the personality inquiry?

DR. SHAPIRO:  Well, as long as, as long as I were free -- you know, first of all, they would be limited by the fact that they are just screening as opposed to comprehensive tests.

THE COURT:  Understood.

DR. SHAPIRO:  And the second thing is, as long as part of that battery I would be able to use the tests that assess motivation, then I could live with it.

Mr. O'Toole did say that he did do the test of memory malingering, which is true, but memory is only one aspect of cognition and there are several other kinds of test that assess motivation in a broader picture.

THE COURT:  Dr. O'Connell, what about the motivational test?  Is that a new wrinkle that somehow changes the game?

DR. O'CONNELL:  No, I think that is one of the things that I was trying to also get at is Mr. Lighty's effort during the testing, so I do think that's a very salient issue.

MR. O'TOOLE:  Your Honor, could we find out what testing specifically they're talking about, because they listed in their notice a short term interview of reported symptoms, which I understand to be a psychiatric symptoms malingering test.  So, I would like to know a broader, broader scope of malingering or did he try to assess some new tests.  So I'd like

to know what test Dr. Shapiro is suggesting.

DR. SHAPIRO:  As His Honor says, you know, I would not be happy with it, but I could restrict it.  I would not have to do the structured interview of reported symptoms, but I would want to do the validity indicator profile, which is a test for assessment of motivation on cognitive tests.

THE COURT:  Dr. McConnell, is that something that you find acceptable?

DR. O'CONNELL:  It is acceptable.  And it's O'Connell, Judge.

THE COURT:  Oh, I'm sorry.  O'Connell, sorry.

DR. O'CONNELL:  That's fine.

THE COURT:  All right.  Well, let me tell you where I am on this.  I mean, this is always an interesting issue, but we're not really here in a pure setting of trying to get the best psychological profile of an individual.

The reality is that the defendant may have opted to do no psychological testing at all.  And whereas the psychological status of the individual would be extremely interesting to people determining whether or not to put this gentleman to death, it doesn't go in because the defendant opts for it not to go in.  It's his choice.

And so, he really does control the extent to which psychological testing gets done at all in this case.  And if he gives you a somewhat stunted, and it sounds like that's the way

it's being done here, referral, that's the way it gets done, and you do the best you can as docs in this case.

So I think we will go with Mr. O'Toole's objections here, modified obviously by what Dr. O'Connell has said about what would be acceptable.  And specifically, Mr. O'Toole, if you want to state which are the tests that you do not want performed, you better state them because, again, I don't have any document in front of me.

MR. O'TOOLE:  The test that I understand and, Dr. O'Connell, if you can check me on this, I believe the first -- I'll just state what you asked for Judge, the ones that we don't want.  MMPI, which is -- MMPI-II, which is the Minnesota Multiphasic Personality Inventory, Rorschach.

THE COURT:  Rorschach.

MR. O'TOOLE:  Rorschach, the Trauma Symptom Inventory that details assessment of post-traumatic test; the Structure Interview of Reported Symptoms and the Personality Assessment Inventory.  Those are the tests that we objected to and have objected to to Mr. Harding over the last several days.

THE COURT:  Dr. O'Connell, do you concur with that?

DR. O'CONNELL:  Yes.

DR. SHAPIRO:  May I just ask one question, sir?  Then is my using the abbreviated Wechsler okay then, the Wechsler Abbreviated Scale of Intelligence?

MR. HARDING:  That was something I supplemented my

motion the next day with an additional test called the WASI test, which is a revised version of the Wechsler test.  It's a cognitive test; is it not, Doctor?

DR. SHAPIRO:  It is, but as it says, it's an abbreviated version.  So again, it's not as comprehensive as the tests that Dr. O'Connell --

MR. HARDING:  But since it's not a personality test, I don't think it's precluded.

THE COURT:  All right.  Does that resolve it though?

DR. SHAPIRO:  Then it's okay for me to give that one also?

THE COURT:  All right.

MR. HARDING:  And if I could ask while we're all still on the line.  Doctor, you have stated that you need certain tests to analyze Mr. Lighty's motivations, and you named the validity indicator profile.  Are any of the other tests that Mr. O'Toole just summarized ones that you think would be needed also to understand motivation?  The Detailed Assessment of Post-traumatic Stress, for example, or the Trauma Symptoms Inventory.

DR. SHAPIRO:  Specifically for motivation, while not each of them has a validity scale, you know, the scale for motivation on them, but they do deal with motivation in terms of interpretation of psychological as opposed to, you know, neuropsychological symptoms.

So, if your -- if the Court's ruling is that I have to restrict myself to exclusively cognitive things, then those tests would not be relevant.

THE COURT:  Well, that's my ruling.  I think that's where we come out.

DR. SHAPIRO:  Yeah, as I said, it just puts me in that awkward position.  There may be some impairment there, but you don't know what it means or what's causing it, but with that understanding, you know --

THE COURT:  Teddy Roosevelt once said, do the best you can with what you got where you are.

DR. SHAPIRO:  Okay.

THE COURT:  So that's really the resolution here.

All right.  Anything else?

MR. O'TOOLE:  No, Your Honor.  Thanks so much.

THE COURT:  Thanks a lot.

(Whereupon, the telephone conference was concluded.)

CERTIFICATE OF COURT REPORTER

I, Linda C. Marshall, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/
_____
Linda C. Marshall, RPR
Official Court Reporter